HUNTINGTON W. JACKSON, Receiver,

*v.*

OLIVER H. HORTON, Receiver, *et al.*

*Filed at Ottawa October 2, 1888.*

1. CONSIDERATION—*compromise of doubtful claim.* On bill to foreclose a trust deed, certain of the defendants set up, in good faith, an equitable claim to the land, (seventy acres,) which they claimed as superior to the lien of the trust deed. By leave of court, a compromise of the litigation was effected, by which the title was to be perfected in

the complainant, to the entire tract, who was to select ten acres thereof and convey the same to the defendants claiming the adverse equitable title, and they were to release all claims to the remaining sixty acres: *Held,* that the agreement for the settlement was based upon a sufficient consideration, namely, the compromise of a doubtful claim prosecuted in good faith.

2. SETTLEMENT BY COMPROMISE—*conditions to be performed, before laches can be imputed.* In such case, as the complainant seeking the foreclosure of the trust deed was not entitled to the releases from the defendants whose claim was settled, until he had first selected and conveyed to them their ten acres of the land, they could not be held guilty of *laches* in failing to release the remaining portion, as until their part was selected and conveyed it could not be determined what the remaining part was.

3. TRUST—*execution dependent on condition.* Where, by means of a compromise by a receiver of a bank, in a proceeding to foreclose a deed of trust on a tract of land, and under the decree of the court in the case, A, B and C, three of the defendants, were entitled to a certain proportion of the tract, to be selected by the receiver, subject only to the condition that after such selection they should convey all their interest in the remainder of the tract, it was *held,* that the receiver, on acquiring the trustee's deed, held the ten acres in trust for A, B and C, to be conveyed to them upon a condition which they could not perform until their part had been first selected by the receiver.

4. SALE—*by a receiver under order of court—what embraced therein—of portion held in trust for a third person.* The receiver of a bank holding the legal title to seventy acres of land, of which sixty acres were subject to sale as assets of the bank, and ten acres were held in trust for certain persons named, when selected by the receiver, obtained leave of the court appointing him, to sell either the whole tract, or his interest therein as receiver, as he might deem best; but he was not to sell the entire tract except upon the consent of the *cestuis que trust,* and in that event the sale was to be for not less than $42,000, but if only the receiver's interest was sold, then it was to be for $36,000. The sale was made without the consent or approval of the *cestuis que trust,* for only $36,000: *Held,* that the ten acres so held in trust could not be regarded, in equity, as having passed by the receiver's deed, which described the property as "all right, title and interest in and to" the tract.

5. SAME—*sale without reservation as to third person—subsequent action to enforce the rights of the latter.* But where a receiver holds the legal title to a tract of land, a portion of which he holds in trust for a third person, and the balance as assets of the debtor, the portion held in trust to be selected by the receiver, which he fails to do, and under an order of court sells the whole to one having notice of the rights of the *cestuis que trust,* the receiver will not thereafter be required to select

the part of the premises held in trust, but a conveyance of a proper proportion will be decreed and a partition ordered between the parties.

6. PURCHASER—*with notice*—*notice to agent*—*how notice may be afforded.* Notice to the agent of a purchaser of land, of the equitable rights of a third person in the same, the agent having been employed in respect of and participated in the transaction, is notice to the purchaser. Such notice may be afforded by the examination of an abstract of title, and also by the decree or order of court under which the sale was made.

APPEAL from the Superior Court of Cook county; the Hon. GWYNN GARNETT, Judge, presiding.

Mr. E. A. OTIS, for the appellant:

The compromise and settlement, in good faith, of disputed claims, when fairly made, will be upheld. *McKinley* v. *Watkins*, 13 Ill. 140; *Honeyman* v. *Jarvis*, 79 id. 318; *Parker* v. *Enslow*, 102 id. 272; *Pool* v. *Docker*, 92 id. 501; Fry on Specific Per. (3d Am. ed.) 183.

Tucker had notice of appellant's rights, through his agent, Ware. The decree of compromise spread upon the record of the court was notice to every one, of these rights. *Morris* v. *Hogle*, 37 Ill. 150.

Until the selection or location of the ten acres, appellant was not bound to make releases of the balance of the tract. Therefore, there was no *laches* in the case. But it is necessary to plead the Statutes of Frauds and Limitations, to avail of them as a defense. *School Trustees* v. *Wright*, 12 Ill. 432; *Hull* v. *Peer*, 27 id. 312; *Hannas* v. *Hannas*, 110 id. 53; *Finucan* v. *Kendig*, 109 id. 198; *Darst* v. *Murphy*, 119 id. 343.

Messrs. LYMAN & JACKSON, also for the appellant.

Mr. JOSEPH N. BARKER, and Mr. JOHN WOODBRIDGE, for the appellees I. K. Tucker and W. B. Gates:

The record does not disclose any equitable title in appellant. An unaccepted offer of compromise is not competent evidence for any purpose. *Stranahan* v. *Haddam*, 11 Conn. 507; *Jones*

v. *Foxall,* 13 Eng. L. and Eq. 140; *City of Peru* v. *French,* 55 Ill. 320; *Paulin* v. *Howser,* 63 id. 312; *Barker* v. *Bushnell,* 75 id. 221.

The record disproves the existence of any contract. Horton, as an officer of the court, was powerless, except so far as he was authorized to act by order of record. *Hooper* v. *Winston,* 24 Ill. 365; High on Receivers, secs. 191, 192.

The sale to Tucker was in itself a withdrawal of the offer of compromise. *Chrisman* v. *Miller,* 21 Ill. 227; *Marshall* v. *Perry,* 90 id. 293.

The long delay of appellant is a sufficient defense, even if there had been a complete executory contract. *Anderson* v. *Frye,* 18 Ill. 95; *Mix* v. *Balduc,* 78 id. 216; *Hoyt* v. *Tuxbury,* 70 id. 338.

A verbal promise to pay, or to part with anything valuable, in settlement of a controversy not existing in the form of a pending suit, can not be enforced in a court of law, without some proof that there was a reasonable ground for such controversy. *Prater* v. *Miller,* 25 Ala. 321; *Stuart* v. *Bradford,* 26 id. 410.

Mr. Justice Magruder delivered the opinion of the Court:

This is a bill filed in the Superior Court of Cook County by Huntington W. Jackson Receiver of the Third National Bank of Chicago, against Oliver H. Horton Receiver of the German Savings Bank of Chicago, Luther K. Tucker, William B. Gates, J. Young Scammon, J. Irving Pearce and Thomas M. Hoyne. The original bill was filed on March 13, 1884, and an amended bill was afterwards filed on May 7, 1885. The amended bill alleges that Horton as Receiver made a deed to Tucker, which had the effect of conveying seventy acres of land when it was intended to convey only sixty acres, and that ten acres of the seventy equitably belonged to Jackson as Receiver and to Pearce and Scammon, and were held in trust for them by Horton. The prayer of the bill is for a reformation of the

deed to Tucker so that it shall not pass the title to the ten acres, for a conveyance of the ten acres by Horton to the complainant, for a partition etc., and for "such other and further relief as equity may require." The Court below dismissed the bill for want of equity and the case is brought here by appeal.

Horton was appointed receiver in 1877 of the German Savings' Bank by the Superior Court of Cook County in the case of *Berls et al.* v. *The German Savings Bank,* and found among its assets a note dated July 17, 1873, for $50,000.00 signed by George H. Ward and secured by a trust deed to Henry Greenebaum, the President of the Bank, upon W. $\frac{1}{2}$ S. W. $\frac{1}{4}$ S. 35, T. 39, N. R. 13 E. in Cook County, containing 70 acres after deducting about 10 acres that were subject to Canal and Railway rights. On February 6, 1878, he filed a bill in the Superior Court to foreclose this trust deed and made Jackson as receiver, Scammon, Pearce, John H. Brown, Joseph T. Brown and Edgar F. Brown defendants thereto. These defendants answered the bill and set up that they owned an equitable interest in the premises, which was alleged to be superior to the lien of the trust deed, and of which the Savings' Bank was alleged to have had notice before it became the owner of the trust deed. The Browns were the original owners of this equitable interest and had assigned it as security for an indebtedness they owed to the Third National Bank of Chicago and to J. Y. Scammon. The Third National Bank, in which Pearce was a stockholder to the amount of $200,000.00, had failed and Jackson was appointed Receiver of it by the Comptroller of the Currency. He found among its assets the claim against the Browns and the assignment of their interest in these premises, made to secure that claim.

It thus appears that, in the foreclosure suit, there was a controversy between Horton as Receiver of the Savings' Bank, on the one side, and Jackson as Receiver of the National Bank, Scammon, Pearce and the Browns, on the other side. Negotiations were entered into between the parties for a settlement

of this controversy. Joseph T. Brown offered to procure conveyances to Horton of the interests of Jackson as Receiver and of Pearce, Scammon, Ward, and the Browns in said premises, so as to vest in Horton a fee simple title thereto free of incumbrance, on condition that Horton, upon acquiring such title, should convey ten acres of the property to Joseph T. Brown. On June 19, 1878, Horton, as Receiver, filed his petition in the Superior Court in the case of *Berls et al.* v. *The German Savings Bank,* recommending a compromise upon the terms thus stated and asking for authority to carry it out. Accordingly, on July 3, 1878, an order was entered by the Court directing him, upon receiving the conveyances aforesaid together with releases of such dower interests as might exist, and upon becoming vested with an absolute title free of incumbrance on or before October 1, 1878 to the premises in question, to convey ten acres thereof to the said Joseph T. Brown.

In pursuance of this order and in consummation of the settlement authorized by it, Horton had obtained before December 21, 1878, an unencumbered title to the seventy acres subject to the rights of Pearce, Scammon and Jackson Receiver, as shown by the petitions and orders hereafter mentioned. The three Browns released to him all their interests in the property; it does not appear that the assignment they made to the Third National Bank was ever put on record. Jackson as receiver and Pearce and Horton as receiver signed a written stipulation, which was filed in the foreclosure suit on October 11, 1878, and is in the following words: "We hereby stipulate and consent that the answer of the defendants * * * Jackson as receiver and * * * Pearce be and the same are hereby withdrawn; *all matters in difference with said defendants having been adjusted.*" Scammon testifies: "I filed an answer in the case of *Horton* v. *Ward et al.* I have never taken the answer off the files, although I consented that it should be withdrawn." On October 12, 1878 the foreclosure suit was dismissed.

It is not shown that Ward, the maker of the trust deed, executed to the Receiver of the Savings Bank the conveyance contemplated by the order of July 3, 1878. But "acting upon the faith of such negotiations" for settlement, the parties in interest made no opposition to a sale under the power contained in the trust deed. Accordingly the premises were advertised for sale and sold on October 14th 1878 by Greenebaum, the trustee, to Horton, as Receiver, for $54,186.00, the amount of the debt and interest. The usual trustee's deed was executed by the trustee to the purchaser and recorded on February 25, 1879.

The receiver of the Savings' Bank had not before December 21, 1878, and has not at any time since then conveyed to Joseph T. Brown or to any of the defendants in the foreclosure suit either ten acres or any other part of the premises in controversy. On that day he filed another petition in the Superior Court stating that he had obtained releases from the Browns; that he had foreclosed the deed of trust by advertisement and sale; that such "foreclosure was, however, subject to the alleged equities of the said Jackson as receiver and said Pearce and Scammon and upon the understanding and agreement that they should severally release all claims to the residue of said land on receiving a conveyance from your petitioner for ten acres thereof" etc.; that "it was impossible to accomplish the whole of said compromise * * * by October 1, 1878;" that, "by the conveyance of ten acres of said land, he can procure the release of all claims and equities of said Jackson as receiver * * * and of said Pearce and Scammon in all the *remaining portions* thereof" etc.; that it is for the interest of the estate "that he be again authorized to convey ten acres of said land to procure releases of said parties and perfect his said title in *the remainder thereof;*" and praying that he may be directed "as such receiver to convey * * * his * * * interest in ten acres of said land, *such ten acres to be selected by your petitioner*" etc., * * *

upon your petitioner receiving from said Jackson  * * * and  * * * Pearce and J. Y. Scammon a full release  * * * of all estate, right, claim or equity  * * * with release of all dower right in  * * * the said *remaining portion* of the said lands included in said deed of trust" etc.

In accordance with the prayer of this petition an order was entered by the Court on January 2, 1879, which, after "finding the facts stated in said petition to be true," proceeds as follows: "It is ordered, adjudged and decreed that Oliver H. Horton, the receiver in this cause,  * * * is hereby authorized and directed to convey  * * * all his  * * * interest  * * * in  * * * ten acres of the lands described in said petition  * * * *such ten acres to be selected by said receiver* and subject to such reservations and limitations as to the location of streets and alleys  * * * through the same as he may deem necessary to a subdivision into lots, blocks, streets and alleys of the whole of said tract of land, upon the receiver receiving from  * * * Jackson as receiver etc., and Pearce a full conveyance  * * * of all their  * * * claim and equity,  * * * including a release of  * * * dower  * * * of the wife of said Pearce, in  * * * all *the remaining portion* of said tract etc.,  * * * and also upon receiving a full release of any right or equity in said land  * * * on the part of J. Young Scammon or his wife etc."

On February 10, 1882, Horton as receiver filed another petition in the Superior Court in the *Berls* case, in which he states that he holds the title to the 70 acres "subject to whatever interest, title, claim and demand therein and thereto there may be in H. W. Jackson as receiver etc., J. I. Pearce and J. Y. Scammon"; that he had been theretofore authorized by the order of the Court to settle with them "by conveying to them 10 acres of said land upon their conveying to your petitioner all interest in *the remainder* thereof, which settlement and compromise has not been consummated"; that he had made an agreement for the sale of the 70 acres for $42,000.00

or $600.00 per acre, $12,000.00 in cash and the balance in three annual payments of $10,000.00 each with interest at 6 per cent; that he believes "he could consummate such sale at once in case said Jackson as such receiver and said Pearce and Scammon would *join therein* or *in due form assent* thereto"; that he believes "he can consummate a sale of *his interest therein* if authorized by this Court to do so" for $36,000.00, payable $10,400.00 in cash, $8600.00 in one year, $8500.00 in two and $8500.00 in three years with 6 per cent interest, "the buyer to pay all commissions;" that he "believes it to be for the best interest of the estate * * * to consummate such sale *in one manner or the other*"; and in which petition he prays that he be authorized "to at once consummate such sale for * * * $42,000.00 upon the terms aforesaid in case said Jackson as such receiver and said Pearce and Scammon properly assent to and approve thereof," and that, in case they "do not at once properly assent to and approve thereof, your petitioner be authorized * * * to at once consummate a sale of *his interest* as such receiver in said premises for * * * $36,000.00 upon the terms aforesaid."

Upon the same day, February 10, 1882, the following order was entered: "Upon reading the petition of Oliver H. Horton as receiver in said cause this day filed herein, it is ordered and decreed that said receiver be and he is hereby authorized and directed to at once either consummate a sale of the" 70 acres above described * * * "or of his interest therein as such receiver, as he may be able or deem best in accordance with the terms stated in said petition."

At 12 o'clock on the same day, February 10, 1882, a special warrantee deed, dated January 21, 1882, acknowledged February 10, 1882, and executed by Horton as receiver to Luther K. Tucker, was filed for record in the Recorder's office of Cook County. The consideration expressed in the deed is $1.00 and the property conveyed is described as follows: "all the following described lot, piece or parcel of land situated in

the county of Cook and State of Illinois and known and de-
scribed as follows, towit: all right, title and interest in and
to the W. ½ S. W. ¼ S. 35 etc."

At the same hour of 12 o'clock on February 10, 1882, a
warrantee deed, dated February 4, 1882, acknowledged Feb-
ruary 8, 1882, and executed by Luther K. Tucker and wife to
William B. Gates, was also filed for record in said Recorder's
office. The consideration expressed in this deed is $56,000.00,
and the property conveyed is described as follows: "the fol-
lowing described real estate, towit: the W. ½ S. W. ¼ S. 35,
·T. 39, N. R. 13 E. of 3d P. M. excepting" railroad and canal
rights.

At 2 o'clock P. M. of February 10, 1882, there was also
filed for record in said Recorder's office a trust deed upon said
property, dated January 21, 1882, acknowledged January 24,
1882, and executed by Luther K. Tucker to Thomas M. Hoyne,
as trustee, for the purpose of securing Tucker's three notes
one for $8600.00 and two each for $8500.00. The deed from
Tucker to Gates recites that it is made subject to this trust
deed, and Gates assumes the payment of the notes thereby
secured.

The controversy in this case is between Gates on the one
side, and Jackson as Receiver and Scammon and Pearce on
the other side. Gates claims to be the owner of the whole
tract of 70 acres through the title obtained by the foregoing
deeds. Pearce, Scammon and Jackson as Receiver claim that
they are entitled to ten acres out of the seventy, and that only
sixty acres of the tract belong to Gates. Upon the trial they
tendered to Gates a deed executed by themselves and the wives
of Pearce and Scammon "conveying to * * * Gates all
the land in controversy except an undivided ten acres thereof
upon Gates conveying ten acres to complainant." On April
18, 1885, an order was entered by the District Court of the
United States for the Northern District of Illinois authorizing
Jackson, as such receiver, to execute the deed so tendered.

It is unnecessary to discuss the question whether the claim to the 70 acres set up by the defendants in the foreclosure suit was valid or not. It may be that, if that suit had gone to hearing, such claim would have been held to be invalid. It is sufficient to say that the parties relying upon it did so in good faith believing that their equities were superior to the lien of the trust deed. Therefore the agreement for a settlement had a sufficient consideration, in that it was the compromise of a doubtful right and put an end to a litigated dispute. (*McKinley* v. *Watkins*, 13 Ill. 140; *Honeyman* v. *Jarvis*, 79 id. 318.)

The receiver of the German Savings Bank derived important advantages from the settlement agreed upon; he received releases from the Browns of all their interest in the seventy acres; he secured the termination of the foreclosure suit; he obtained title through a sale under the power contained in the deed of trust. His policy was to subdivide the acre property owned by the Bank into blocks and lots and pay off the indebtedness of the Bank by deeding such lots to the creditors in exchange for their bank books. He was in a position to thus utilize sixty acres of the tract in controversy by reason of the advantages derived from the agreement of compromise. Through the title acquired as a result of that compromise, he has been enabled to make a sale from which his bank has realized at least $36,000.00. In return for these advantages he has parted with nothing. Surely it is not equitable that one party to an agreement of settlement should reap all the benefits and that the other party should receive no benefit whatever.

It is true, that, before Horton sold the property to Tucker or Gates, he obtained no releases or conveyances from Pearce and Scammon and Jackson, the receiver. But he was to be the moving party in the matter of procuring such releases and he made no movement in that direction. By the order or decree of January 2, 1879, he was directed to convey to Pearce

and Scammon and Jackson ten acres *to be selected* by himself as receiver, and they were to convey to him their interest in "*all the remaining portion* of said tract." He was first to *select* the ten acres to be conveyed to them. Until he made such selection, it could not be determined what the "*remaining* portion" of the tract was. Therefore, they can not be justly chargeable with *laches* in not making the releases called for by the decree.

The record shows, that, in 1883, they objected before the Superior Court to the final discharge of Horton as receiver, and moved for a correction of the deed to Tucker, so as to preserve their rights in ten acres of the property. But that court overruled their motion and objections, on the ground that the relief asked for could not be properly granted in the *Berls* suit but should be sought in an original proceeding, and thereupon granted leave to the receiver of the Third National Bank to file a bill against the receiver of the German Savings Bank. The present suit was instituted in pursuance of such leave.

The decree of July 2, 1879, fixed no limit of time within which the conveyances required of the respective parties were to be made or tendered. If Horton as receiver had at any time selected the ten acres and tendered a deed therefor to Pearce, Scammon and Jackson, a delay on their part thereafter to make a conveyance of their interest in the remainder of the land would have furnished grounds for the charge of *laches*. But no selection of ten acres was ever made and no deed of ten acres was ever tendered.

By the terms of the compromise and of the decree of January 2, 1879, Pearce, Scammon and Jackson as receiver were entitled to ten acres of the tract to be selected by Horton as receiver, subject only to the condition that, after such selection, they should convey all their interest in the remainder of the tract. It follows, that Horton held ten acres of the tract in trust for them to be conveyed to them upon a condition,

37—126 ILL.

which they could not perform until he had first made a selection. Did their interest pass by the deed to Tucker?

Horton testifies that he received $36,000.00 in cash and notes as above specified for his transfer to Tucker, and that he intended to sell nothing but his own interest as receiver, which he regarded as sixty acres, and which, at $600.00 per acre, amounted to the $36,000.00. He certainly could not sell the land without an order from the Superior Court. We must look to the order of February 10, 1882, for his authority to make a sale. That order furnishes the measure and extent of his power in the premises. It refers to the petition filed on the same day and authorizes him to either sell the whole seventy acres or his interest therein as receiver, "as he may be able or deem best in accordance with the terms stated in the petition." The word, "terms," as here used does not refer merely to the amount, in cash and notes, for which the sale was to be made and the dates at which the notes were to be paid. It refers to all the conditions and provisions stated in the petition.

By referring to the petition it will be seen, that the receiver was only to sell the whole tract in case Jackson, Scammon and Pearce should consent to such sale and approve of it. The petition recognizes their interest and recites that the title is held subject thereto. The receiver had no power to sell their interest without their consent and approval. According to the allegations of the petition the whole tract, if sold at all, was to be sold for $42,000.00 or $600.00 per acre. Before the entry of the order of February 10, 1882, Pearce positively refused to sell for $600.00 per acre and wanted $1000.00 per acre. Scammon was unwilling to sell for less than $800.00 per acre. Jackson swears that he did not consent to the sale at $42,000.00, although, so far as he was individually concerned, he was not opposed to it. As he was acting in a representative capacity, he could do nothing against the wishes of Pearce and Scammon.

But the order of February 10, 1882, construed in connection with the petition, contemplated that the approval of Pearce, Scammon and Jackson was to be obtained *after* the entry of the order, and was to be manifested by their joining in the sale or assenting thereto "in due form." It clearly appears, however, that, after the order was entered, they were not consulted at all. Their consent and approval were not asked. Jackson was absent in the State of New Jersey, where he had gone about the 24th or 25th of January, 1882, and he testifies that "on a telegram he could have returned on 24 hours' notice." Indeed the record shows that the deed from Tucker to Gates and the trust deed to Hoyne were executed before February 10, 1882, and that the deed from Horton as receiver to Tucker was executed before 12 o'clock on that day.

Inasmuch, therefore, as the Receiver of the Savings' Bank had no power to sell the seventy acres for less than $42,000.00, nor at that figure without the consent and approval of Jackson, Pearce and Scammon, and inasmuch as their consent and approval were not obtained and the sale as actually made was for only $36,000.00, the ten acres in question can not be regarded in equity as having passed by the deed to Tucker.

According to the testimony of Tucker and E. C. Ware the latter was the agent of the former in the purchase of the property. Ware had actual notice of appellant's claim to the ten acres, because he went to Pearce to find out at what price the ten acres could be bought. Hence, if Tucker be regarded as a real purchaser, he must be held to have had notice of appellant's rights through the notice to his agent.

It is claimed, however, that Gates was a bona fide purchaser of the whole tract from Tucker without notice of appellant's claim to ten acres. As above stated, the consideration named in the deed from Tucker to Gates was $56,000.00. By the terms of the contract made in Tucker's name for the sale of the property to Gates, the latter agreed to pay $50,000.00. He testifies that, as matter of fact, he paid only $44,000.00

and can give no explanation of the deduction of $6000.00 from the original contract price.  Of the $44,000.00, $18,400.00 was paid in cash and the remaining $25,600.00 by assuming the three notes secured by the trust deed above mentioned.

Joseph N. Barker was the attorney of Gates and examined the title for him.  He was also the agent of Gates in the matter of closing up the trade and receiving the title papers and paying the purchase money, Gates being at that time in New York.  He introduced Gates to Ware; the contract between them was signed in his office; he went with Gates and Ware to see the property and advised freely with the former about the matter; he says he bought the property and paid for it for Mr. Gates; Gates speaks of him as "to a certain extent perhaps my agent in the matter."  Horton testifies, that he explained to both Ware and Barker that he could not sell the whole tract, because the parties claiming the ten acres refused to join in the sale and Jackson, their representative, was absent from the city, and that he informed them of his inability to sell any more than sixty acres and figured with them on $36,000.00 as the price of sixty acres at $600.00 per acre. Barker says in his testimony that Horton is mistaken, that there was no talk about sixty acres, that he, as Gates' attorney, never thought of buying 60 acres, but "the examination was made for the whole tract described in the deed."  Whatever may be the fact as to what took place in the interviews between these witnesses, there are other circumstances which were sufficient to put Barker upon inquiry as to appellant's rights.

It is undisputed that Barker received from Ware and examined an abstract of title to the property brought down to January 25, 1882.  This abstract showed the foregoing petitions of June 19 and December 21, 1878, and the orders of July 3, 1878 and January 2, 1879.  These petitions and orders furnished full information as to the interest of Pearce, Scammon and Jackson in the ten acres in question.  (*Morris* v.

*Hogle,* 37 Ill. 150; *Insurance Co.* v. *Ford,* 89 id. 252.) Furthermore, Barker says in his testimony, that on February 10, 1882, he went to the clerk's office and examined the petition filed on that day and the order entered on that day. He was therein informed, that Horton as receiver held his title subject to the rights of Pearce, Scammon and Jackson, and had no power to sell the whole tract without the consent and approval of those parties, nor for any less sum than $42,000.00. He must have known that, although the expressed consideration in the deed to Tucker was only $1.00, the actual consideration received by the Savings' Bank was $36,000.00, because Gates assumed the payment of the trust deed to Hoyne and that trust deed secured the notes mentioned in the petition of February 10, 1882, as being a part of the $36,000.00. Knowing that $36,000.00 was the consideration of the deed from Horton to Tucker, he could but know from the terms of the petition and order of February 10, 1882, that for that amount Horton had no power to sell the whole tract, but was only authorized to sell the *receiver's interest* in the whole tract.

If it could be successfully maintained, that Tucker was the only party, who was bound to take notice of the rights of appellant and Pearce and Scammon or to make inquiry as to how far Horton was acting in accordance with the powers conferred upon him as receiver, and that Gage was under no obligations to take such notice and make such inquiry, it could only be so maintained by showing conclusively, that Tucker was a real purchaser from Horton and that Gage was a bona fide purchaser from Tucker. We are satisfied, however, from a careful study of the record, that Tucker had no real interest in the matter, but was made use of by Ware, or by Ware and Barker, as a conduit through which to pass the title to Gates. Of the $44,000.00 paid by Gates only $36,000.00 went to the Savings' Bank and $8000.00 remained in the hands of Ware.

It has already appeared that Tucker made his deed to Gates and his trust deed to Hoyne before he received any conveyance

from Horton. There was a written contract for the sale of the property by Horton to Tucker and a written contract for the sale of it by Tucker to Gates, but neither of these contracts has been produced in evidence. Gates says: "Mr. E. C. Ware of Pierce & Ware first called my attention to this property, which was in the early part of January 1882. * * * I think the date of the contract was in the fore part of January, sure. It was earlier than the 15th. I should think it was from the 8th to the 12th of January." Horton says: "My best recollection is there was a written contract for thirty days for consummation of sale. * * * I think the notes and deeds were dated back to the time when the contract for the sale was made." The deed to Tucker and the notes and trust deed are dated January 21, 1882. Therefore, the contract for sale to Gates was made before the contract for sale to Tucker, the former being dated "from the 8th to the 12th of January" and the latter on the 21st of January.

The testimony shows that Tucker was an Insurance solicitor, and had no money, and that all the money paid to Horton came from Gates. Ware says: "Mr. Gates advanced the money for Mr. Tucker." Tucker testifies, that he had no conversation with Horton as to the purchase of the property; that Ware conducted the negotiations; that he never saw the abstract of title, and does not know whether it was examined, and can not remember whether he paid for its examination or not; that he never saw Mr. Gates until the day of the trial of this cause; that he can not state how much money he paid Horton for the property and can not "approximate the amount"; that he did not "personally, physically give any money * * * to Mr. Horton or Mr. Ware or Mr. Pierce"; that he does not remember how much commission he paid Ware, and can not state who filed for record the deed from Horton to himself, or who delivered the deed from himself to Gates; that he can not state how much money he received from Gates for the sale of the property to him, whether

$2000.00 or $1000.00 or $500.00; that Ware, his agent, received something, but he "did not get it"; that he does not know what Gates paid for the property, or whether $36,000.00 was the true consideration paid to Horton, or that there was a profit of $8000.00; that he does not remember what the profit was.

Ware's recollection is equally faulty with that of Tucker as to all these matters. The deed from Horton to Tucker and the deed from Tucker to Gates were delivered to Barker at the same time. Barker took both deeds to the Recorder's office and recorded them at the same time, that is to say, at 12 o'clock on February 10, 1882. Barker paid the money for Gates to Ware. Ware can not remember the amount of the check he gave Horton or the amount of the check Barker gave him. Barker can not remember whether he gave Ware his own check or that of Gates.

It is objected on the part of Gates, that Jackson as receiver of the Third National Bank was not in a position to carry out the compromise agreed upon for want of an order from the United States District Court permitting him to do so. This objection is not well founded. Horton was never in a position to demand a deed of Jackson because he never selected the ten acres. It was time enough for Jackson to get the necessary authority to act, after the selection was made and the "*remainder*," which he was to give a deed for, was ascertained. It is to be noted, that this objection was never made by Horton, who admits the agreement for compromise as claimed by appellant, and disclaims any intention of having disposed of appellant's interest. It is to be further noted, that the Receiver of the Third National Bank *did* obtain the order authorizing him to convey his interest in the property before the amended bill in this cause was filed.

It is manifest that the selection of the ten acres in question can not now be made by the Receiver of the Savings Bank. So long as the Savings Bank held the title to the whole tract

of seventy acres, its receiver, by selecting ten acres for the outside claimants, would thereby at the same time select the particular sixty acres to be retained by the bank for itself. Now, however, it is admitted that Gates owns sixty acres or six-sevenths of the property. It might not be just to him to compel him to accept the particular sixty acres, which the receiver would be setting off to him by selecting the ten acres. Nevertheless, equity will not suffer the rights of appellant and of appellees Pearce and Scammon to be lost through want of a remedy for their enforcement. We, therefore, think that the ten acres should be set apart through the ordinary machinery of a partition proceeding as prayed for in the bill.

The decree is reversed and the cause is remanded to the Superior Court, with directions to proceed in accordance with the views here announced, and with further directions that, before the partition herein provided for, Gates, Tucker and Horton as Receiver be required to convey an undivided ten acres to Jackson as Receiver as aforesaid in trust for the Third National Bank and Pearce and Scammon as their interests may appear, upon the latter conveying to Gates their interest in the other undivided sixty acres of the tract.

*Decree reversed.*